UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DAVID CAMPBELL and | § | |
| KORI CAMPBELL, | § | |
| | § | |
|    Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-CV-0516-B |
| | § | |
| RACETRAC PETROLEUM, INC. | § | |
| | § | |
|    Defendant. | § | |

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendant RaceTrac Petroleum, Inc. ("RaceTrac")'s Rule 12(b)(6)

Motion to Dismiss (Doc. 12). For the reasons explained below, the Court **GRANTS IN PART** and

**DENIES IN PART** Defendant's motion.

I.

BACKGROUND

A.    *Factual Background*

This case arises out of an altercation over a closed gas station restroom. The facts below are

taken from Plaintiffs' account of the event.

On the evening of May 24, 2020, David and Kori Campbell ("David", "Kori", or "the

Campbells"), stopped at a RaceTrac gas station ("the RaceTrac") to buy gas and cigarettes. Doc 1-1,

Original Pet., ¶ 10. David "went inside the RaceTrac to purchase cigarettes and use the restroom."

*Id.* The store's clerk ("Woods") "confronted [David] and told him that the restrooms were closed."

*Id.* at ¶ 11. After David "questioned why the restrooms were closed … [Woods] became immediately belligerent and confrontational" and "[a] brief argument ensued." *Id.* at ¶ 12. David left and Woods followed, threatening him and "brandish[ing] a screwdriver and a box cutter." *Id.* at ¶ 13. This made David fear "for his life and his wife's life," so he "reached for a gun he kept in his vehicle" and told Woods "to back off." *Id.* at ¶ 14. The Campbells got into their vehicle and drove away. *Id.* at ¶ 16. But, Woods chased their car and threw "a large windshield squeegee" that struck the departing car. *Id.* at ¶ 16. So, "the Campbells returned to the RaceTrac" where "[Kori] called 911 for police assistance." *Id.* at ¶ 18. Woods, now with "two screwdrivers and the box cutter" threatened them again. *Id.* at 19. David again got out his gun. *Id.* at 20. At last, the police arrived and the altercation ended. *Id.* at ¶ 21. Woods was arrested and charged with aggravated assault. *Id.*

B.    *Procedural Background*

On December 28, 2020, the Campbells brought this suit against Defendant RaceTrac, the Richardson RaceTrac's operator, in the 68th Judicial District Court, Dallas County, Texas. Doc. 1-1, Original Pet. On March 5, 2021, RaceTrac removed the case to the Northern District of Texas. Doc. 1, Notice of Removal. Upon RaceTrac's motion, the case was abated until May 28, 2021, to comply with the notice requirement of the Texas Deceptive Trade Practices Act ("DTPA"), found at Section 17.505(a) of the Tex. Bus. & Com. Code. Doc. 11, Elec. Order. On June 3, RaceTrac filed a Motion to Dismiss for Failure to State a Claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Doc. 12, Def.'s Mot. The Motion is fully briefed and ripe for consideration. The Court considers it below.

## II.

## LEGAL STANDARD

A.     *Federal Rule of Civil Procedure 12(b)(6)*

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). If a plaintiff's complaint fails to state such a claim, Rule 12(b)(6) allows a defendant to file a motion to dismiss. FED. R. CIV. P. 12(b)(6). In analyzing a motion to dismiss for failure to state a claim under Rule 12(b)(6) "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).

A Rule 12(b)(6) motion to dismiss should be granted only if the complaint does not include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

Well-pleaded facts of a complaint are to be accepted as true. *Iqbal*, 556 U.S. at 664. But, legal conclusions are not "entitled to the assumption of truth," nor will a complaint suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). Further, a court is not to strain to find inferences favorable to the plaintiff or accept conclusory

allegations, unwarranted deductions, or legal conclusions. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citations omitted). The court does not evaluate the plaintiff's likelihood of success but only determines whether the plaintiff has pleaded a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

## II.

## ANALYSIS

Below, the Court considers the Campbells' claims. First, the Court examines whether the Campbells have standing to assert claims against RaceTrac under the DTPA, concluding they do not. Second, the Court considers the Campbells' claims that RaceTrac is vicariously liable for the alleged assault committed by its employee, Woods. The Court concludes that RaceTrac is not vicariously liable for Woods's alleged assault under either a theory of respondeat superior or ratification. Third, the Court turns to the Campbells' claims of negligence per se, which the Court rejects as a matter of law, finding no statutory violation. Fourth, the Court considers the Campbells' claim for general negligence, finding that the claim is inadequately pled. Fifth, the Court considers the Campbells' claims for negligent hiring and supervision, finding that the Campbells have stated a claim for negligent supervision but that the negligent hiring claim is inadequately pled. Sixth, the Court considers the Campbells' claim for exemplary damages, finding that no basis for exemplary damages has been adequately pled. Finally, the Court grants Plaintiffs leave to amend their complaint as to the general negligence, negligent hiring, and exemplary damages claims.

A.      *The DTPA Claims*

The Campbells bring claims under the DTPA, stating that they relied on RaceTrac's "false, misleading and deceptive" representations and statements regarding its goods and services and were

thereby injured. Tex. Bus. & Com. Code § 17.46 *et seq.*; Doc. 1-1, Original Pet., ¶¶ 55–57. Specifically, the Campbells state that RaceTrac: (1) misrepresented that it "maintained clean public restrooms;" (2) "misrepresented that customer service would be friendly;" (3) "falsely and/or recklessly represented and promised it would diligently, competently and faithfully provide friendly service and make [their] visit and use of the RaceTrac's services enjoyable;" (4) "misrepresented that [they] would be safe from harm or danger from one of RaceTrac's employees;" and (5) "misrepresented that a manager was on the premises and would adequately and competently supervise the employees, including [Woods]." *Id.* at ¶ 57. Additionally, the Campbells claim RaceTrac "knowingly" made these misrepresentations, entitling them to additional damages and attorney's fees. *Id.* at ¶ 59–61. RaceTrac urges the Court to dismiss the Campbells' DTPA claims, as the Campbells are not "consumers" as defined by the DTPA and therefore lack standing to bring such claims or to recover under the DTPA. Doc. 13, Def.'s Br., 8–10. Below, the Court considers whether the Campbells are consumers as defined by the DTPA and concludes that they are not.

### 1.    The Campbells lack "consumer" standing.

The DTPA provides consumers a cause of action for "false, misleading, or deceptive acts or practices." Bus. & Com. § 17.50(a)(1). To recover under the DTPA, a "[p]laintiff must establish that he is a consumer under the statute and that his consumption was the producing cause of his injuries." *McClung v. Wal-Mart*, 866 F. Supp. 306, 308 (N.D. Tex. 1994) (citing *Rojas v. Wal-Mart*, 857 F. Supp. 533, 535–37 (N.D. Tex. 1994) (citing *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 173 (Tex. 1980))). Whether a plaintiff is a consumer—and thus has standing to sustain a claim under the DTPA—"is a question of law to be determined by the court." *Johnson v. Walker*, 824 S.W.2d 184, 187 (Tex. App.—Fort Worth 1991, writ denied).

The DTPA defines a "consumer" as "an individual . . . who seeks or acquires by purchase or lease, any goods or services." Bus. & Com. § 17.45(4); *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996)(citations omitted). "Goods" are defined as "tangible chattels . . .  purchased or leased for use." Bus. & Com. § 17.45(1). Services are defined as "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." *Id*. § 17.45(2). No privity of contract with a defendant is required for the plaintiff to be a consumer. *Amstadt*, 919 S.W.2d at 649 (citations omitted). Instead, "[i]n determining whether a plaintiff is a consumer, [the] focus is on the plaintiff's relationship to the transaction." *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 815 (Tex. 1997) (citing *Amstadt*, 919 S.W.2d at 650). The key inquiry in determining consumer status is "whether the goods or services regarding which the plaintiff claims an injury were an objective of a qualifying transaction or 'merely incidental to it.'" *Perry Equip. Corp.*, 945 S.W.2d at 815 (quoting *Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 500 (Tex. App.—Houston [14th Dist.] 1994, writ denied)).

Here, the Campbells state that they went to the RaceTrac "to purchase gas and cigarettes," and that "[David] went inside the RaceTrac to purchase cigarettes and to use the restroom." Doc. 1-1, Original Pet., ¶ 10. Below, the Court explains why these alleged facts do not qualify them as consumers of goods or services under the DTPA.

I.      *The Campbells do not assert DTPA claims based on gas and cigarette purchases.*

The Campbells do not plead that they were harmed by any alleged misrepresentation made by RaceTrac regarding the gas or cigarettes they sought to purchase. *See* Doc. 1-1, Original Pet., ¶ 29 (stating that the argument and resulting injuries "stem[med] directly" from Woods's communication that the restrooms were closed). Therefore, the intended transactions in gas and cigarettes (goods

-6-

under the DTPA) were not the producing cause of the Campbells' injuries and will not support the Campbells' DTPA claims. *See McClung*, 866 F. Supp. at 308 (finding that a customer's purchase of a cell phone did not support a DTPA claim where his claimed injury was false imprisonment related to the store's failure to remove a security sensor, not a complaint about the quality of the phone); *Rutherford v. Whataburger, Inc.*, 601 S.W.2d 441, 444 (Tex. App.—Dallas 1980, writ ref'd n.r.e.) (finding that a customer's purchase of a fast food meal did not support a DTPA claim where his claimed injury was based on the quality of the no-purchase-required sweepstakes prize he received after his purchase, not the quality of the food he purchased).

ii.    *The Campbells cannot maintain DTPA claims based on free public restroom services or customer service.*

The Campbells do complain about the lack of an available restroom and about Woods's "unfriendly" customer service. Doc. 16, Pl.'s Resp., ¶¶ 51–52. They state that "[t]he availability to use its public restrooms is part of RaceTrac's business operations and a service to its customers." *Id.* ¶ 52. The Campbells further state that David's desire to use the RaceTrac's bathrooms was an objective of their visit because he went inside "to use the restroom" and that RaceTrac "expressly invites" members of the public to visit, promising "friendly customer service [and] clean restrooms." Doc. 1-1, Original Pet., ¶ 10. However, even if the use of the restrooms was "an objective" of the Campbells' visit to the RaceTrac, use of the restrooms was not a qualifying "service" under the DTPA, nor was Woods's customer service, as the Court explains below. The Campbells therefore lack standing to bring DTPA claims based on the restroom closure and resulting altercation.

A DTPA claim based on a "service" requires that either (1) the customer sought or acquired the service by purchase or lease, or (2) that the service was furnished in connection with the sale of

goods. *See* Bus. & Com. § 17.45(2).

The first prong applies when the service itself "was the objective" of an attempted or completed purchase or lease and the service leased or purchased caused the injury. *Henry v. Cullum Cos., Inc.*, 891 S.W.2d 789, 796 (Tex. App.—Amarillo 1995, writ denied). Here, the Campbells do not plead that they sought to lease or purchase use of the restrooms, or that use of the restrooms or Woods's customer service were part of some larger service package offered for purchase or lease. *See* Doc. 1-1, Original Pet.; *c.f. Rickey v. Hou. Health Club, Inc.*, 863 S.W.2d 148, 151–52 (Tex. App.—Texarkana 1993, writ denied) (finding that the plaintiff was a consumer under the DTPA where he had purchased a health club membership that included use of the track on which he was injured); *Craig v. Mixon*, 1998 WL 466133, at *4 (Tex. App.—Amarillo, Aug. 11, 1998, pet. denied) (finding that a caterer who was injured in a rented banquet facility could bring a DTPA claim regarding the quality of the facility). Therefore, the Campbells are not customers under the first prong, because the RaceTrac's public restroom was not sought or obtained by purchase or lease, nor was its customer service.

The second prong applies for services furnished in connection with the sale of goods. In these claims, a person intended to obtain or obtained goods by lease or purchase, and the complained-of services were "collateral to that end." *Henry*, 891 S.W.2d at 796. Texas law limits DTPA claims based on such collateral services to those *directly* related to a specific sale and that "might enter into a consumer's consideration when buying a good." *McClung*, 866 F. Supp. at 309 (citing *Schmueser v. Burkburnett Bank*, 937 F.2d 1025, 1029 (5th Cir. 1991)); *see also Henry*, 891 S.W.2d at 796; *Rowhanian*, 774 S.W.2d at 682. Examples include a product warranty, maintenance obligation, guarantee to replace stolen traveler's checks, or financial counseling as part of a securities

transaction. *See McClung*, 866 F. Supp. at 309; *Henry*, 891 S.W.2d at 796; *Rowhanian*, 774 S.W.2d at 682. By contrast, courts disallow DTPA claims based on services only *incidentally* related to a sale of goods. *E.g., Henry*, 891 S.W.2d at 796. Examples of incidental services include use of a store's floors or customer services while shopping. *See McClung*, 866 F. Supp. at 308 (finding that the plaintiff's complaints about customer service were noncognizable under the DTPA and, at most, only incidental to his purchase of goods); *Henry*, 891 S.W.2d. at 795 (finding no DTPA consumer status based on condition of the floor for customer who walked on grocery store floor while shopping for goods); *Rojas*, 857 F. Supp. at 535–37 (finding same); *Geri v. Starbucks Corp.*, 2020 WL 3883255, at *2 (W.D. Tex. July 9, 2020) (finding same).

In considering how this second-prong standard applies to the present case, the court finds *McClung*—a case from this district with materially analogous facts—instructive. *See* 866 F. Supp. at 309. In *McClung*, a customer purchased a cell phone from Wal-Mart. *Id.* at 308. The cashier neglected to remove the phone's security device and the customer triggered an anti-theft alarm leaving the store. *Id.* In the parking lot, Wal-Mart employees confronted the customer, detained him, and took the phone. *Id.* The customer brought DTPA claims against Wal-Mart, claiming in relevant part that Wal-Mart "advertise[d] and promise[d] . . . a superior shopping experience that it failed to provide because he was assaulted by a Wal-Mart employee . . . and that Wal-Mart expressly promises satisfaction with every transaction and a superior level of friendliness which it failed to provide." *Id.* at 309. The *McClung* court emphatically rejected the idea that the DTPA's definition of services could stretch to include such claims. *See id.* "The 'services' that the Plaintiff complains of are not services under the Act, *see* § 17.45(2)," the court explained. *Id.* Indeed, "[i]t would be absurd to allow a DTPA claim to stand on the grounds that the customer did not receive a 'superior

shopping experience' or because one of the employees was not 'friendly.'" *Id.* Moreover, the employee interactions the plaintiff complained of were "incidental to, rather than in connection with, his purchase of a telephone and cord from Wal-Mart." *Id.* (citing *Rojas*, 857 F. Supp. at 537).

As *McClung* shows, the Campbells cannot claim customer status under the second prong. Accepting as true the Campbells' statement that RaceTrac provides restrooms as a service for its goods-buying customers, Doc. 16, Pl.'s Resp., ¶ 52, this public restroom service is merely incidental to customers' goods purchases, not directly related to a specific sale. *C.f. McClung*, 866 F. Supp. at 309. Nor is, under these circumstances, customer service itself a service under the DTPA. *Id.*

For these reasons, the Court finds that the Campbells are not consumers under the DTPA and therefore lack standing to maintain DTPA claims. Accordingly, the Court **DISMISSES WITH PREJUDICE** Plaintiffs' DTPA claims.

B.     *The Assault Claim*

Plaintiffs bring a claim for "civil assault" against RaceTrac, stating that Woods assaulted David and that RaceTrac is vicariously liable for this assault under theories of respondeat superior and ratification. Doc. 1-1, Original Pet., 62–76; Doc. 16, Def.'s Reply, 29–32. RaceTrac states that the assault claim must be dismissed because "[t]he intentional tort of assault . . . cannot be imputed vicariously to RaceTrac . . . occurr[ing], if it did, outside the scope of Woods's employment." Doc. 19, Def.'s Reply, 7.

The Court agrees that the facts as recounted by the Campbells, if true, would support a claim for assault against Woods, who is not a defendant in this case. Below, the Court analyzes whether RaceTrac is vicariously liable for Woods's alleged assault under either a theory of respondeat superior or ratification. Concluding that the Campbells have not established that Woods was acting in the

-10-

scope of his employment or in the interest of RaceTrac, the Court finds the Campbells fail to state a claim for assault against RaceTrac on either basis.

1.      Respondeat Superior

"Under the doctrine of respondeat superior, an employer is vicariously liable for the negligence of an agent or employee acting within the scope of his or her agency or employment, although the principal or employer has not personally committed a wrong." *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998) (citations omitted). Here, the parties do not dispute that Woods was a RaceTrac employee at the time of the alleged assault, so the issue is whether Woods was acting within the scope of his employment.

Under Texas law, "it is not ordinarily within the scope" of employment for an employee to "commit an assault on a third person." *Texas & P. Ry. Co. v. Hagenloh*, 247 S.W.2d 236, 239 (Tex. 1952) (citation omitted). Most often, assault committed by an employee is "the expression of personal animosity." *Id.* at 239. Generally, such an act is not done for the employer but is personal to the employee. *Id.*; *see also Green v. Jackson*, 674 S.W.2d 395, 398 (Tex. App.—Amarillo 1984, writ ref'd n.r.e.); *Kendall v. Whataburger, Inc.*, 759 S.W.2d 751 (Tex. App—Houston [1st] 1988, no writ); *Viking v. Circle K Convenience Stores, Inc.*, 742 S.W.2d 732, 734 (Tex. App.—Houston [1st] 1987, writ denied).

The cases where assault is found to be within the scope of employment "are comparatively few." *Hagenloh*, 247 S.W.2d at 239. A key consideration is whether the employee, in assaulting the third party, was "acting in furtherance of [the employer's] business." *Id.* An assault may be within the scope of employment "when the assault is of the same general nature as the conduct authorized by the employer or is incidental to the conduct authorized," as with bouncers or other employees

whose position "involves the use of force." *Knight v. City Sts., L.L.C.*, 167 S.W.3d 580, 583 (Tex. App.—Houston [14th] 2005, no pet.) (citing *Smith v. M. Sys. Food Stores, Inc.*, 297 S.W.2d 112, 114 (Tex. 1957)). In such cases, "the employer can be found liable for its employee's actions even if the employee uses greater force than is necessary" or authorized. *Id.* at 583 (citing *Hagenloh*, 247 S.W.2d at 239). Or, an assault may be in the scope of employment where "the employee's duty is to guard the employer's property" and the assault occurs as the employee seeks to protect, retain, or claim such property. *Hagenloh*, 247 S.W.2d at 239–240; *see also Frito Lay v. Ramos*, 770 S.W.2d 887, 888 (Tex. App.—El Paso 1989), *rev'd on other grounds*, 784 S.W.2d 667 (Tex.1990).

Here, the Campbells claim that Woods was acting within the course and scope of his employment at the time of the assault because Woods was employed by RaceTrac, "was on the [p]remises," and "interacted with customer David Campbell as a RaceTrac [customer service] employee." Doc. 16, Pl.'s Resp., ¶ 37. In his role as clerk, "[Woods] refused [David] access to the public restrooms, and rather than delivering the 'friendly service' advertised by RaceTrac, [Woods] was belligerent, attacked and threatened [David] with instrumentalities of his work at RaceTrac": a box-cutter, two screwdrivers, and a squeegee. *Id.*

However, the Campbells' account of David and Woods's encounter does not plausibly support an inference that Woods was acting to further any business of RaceTrac's when he assaulted David. Instead, it supports the more usual inference that Woods assaulted Campbell out of personal animosity. *See, e.g.*, *Hagenloh*, 247 S.W.2d at 198; *Sheffield v. Cent. Freight Lines, Inc.*, 435 S.W.2d 954, 956 (Tex. App.—Dallas 1968, no writ) (citing *Home Tel. & Elec. Co. v. Branton*, 7 S.W.2d 627, 629 (Tex. App. 1928), *aff'd*, 23 S.W.2d 294 (Tex. Comm'n App. 1930)).

Specifically, the Campbells plead that the encounter proceeded in this way: After David

entered the RaceTrac, Woods "confronted [David] and told him that the restrooms were closed."
Doc 1-1, Original Pet., ¶¶ 10–11. When David "questioned why the restrooms were closed," Woods
"became immediately belligerent and confrontational." *Id.* ¶ 11. "A brief argument ensued." *Id.* ¶ 12.
David then exited the store, followed by Woods, who "threatened [David] and brandished a
screwdriver and a box cutter." *Id.* ¶ 13. David responded by retrieving a gun from his vehicle and
using the threat of the gun to hold Woods off. *Id.* ¶ 14. The Campbells then drove away, while
Woods gave chase and threw a "large windshield squeegee" that hit the car. *Id.* ¶ 16. The Campbells
came back to the RaceTrac and called 911, and the men's altercation resumed, now with Woods
threatening David with two screwdrivers and a box cutter, and David threatening Woods with his
gun. *Id.* ¶¶ 18–20. This continued until the police arrived. *Id.* ¶ 21.

This account includes no facts to suggest that Woods, employed as a clerk, was authorized
by RaceTrac to use force in interacting with customers, or that his assaultive actions were incidental
to his authorized actions, as in the bouncer cases. *C.f. Knight*, 167 S.W.3d at 583 (finding that a
plaintiff had not shown that the club employees who assaulted him were bouncers); *Kendall*, 759
S.W.2d at 752–53 (finding that a fast food customer service employee's assault on a complaining
customer "could not possibly have been so connected with and immediately arising out of his job of
taking food orders, and preparing and delivering food orders to customers" that the assault was
imputable to the employer).

Nor was Woods plausibly acting to protect RaceTrac's property, where the Campbells do not
allege that Woods acted to prevent David from entering the closed restroom, nor that Woods had
authority to do so. *Compare Ramos*, 770 S.W.2d at 888 (finding that a manager was acting in the
scope of his employment when he assaulted a customer who would not part with company property

-13-

to take the property back, where evidence showed that maintaining custody of store property was within his duties), *with ANA, Inc. v. Lowry*, 31 S.W.3d 765, 770 (Tex. App.—Houston [1st] 2000, no pet.) (finding that a plaintiff had not introduced evidence that the convenience store employee's duties included maintaining control over company property).

Instead, the Campbells merely claim Woods "informed" David the restroom was closed, David "questioned" the closure, Woods "became belligerent and confrontational," and David exited, pursued by the angry and threatening Woods. Doc. 1-1, Original Pet., ¶¶ 10–13. This suggests only that some personal animosity quickly arose between the two men. *See id.* ¶ 33 (stating that the two men "got into an argument that escalated to the point that Mr. Woods threatened and attacked the Campbells").

Neither does the Campbells' claim that Woods assaulted the Campbells with "instrumentalities" of his employment at RaceTrac (the box cutter, screwdrivers, and squeegee), Doc. 16, Pl.'s Resp., ¶ 37, itself establish vicarious liability. Use of "instrumentalities of employment" to perpetrate an assault does not necessarily make the assault within the scope of employment. *See Kendall*, 759 S.W.2d at 755 (fast food employee's assault on customer with french fry basket not within scope of employment).

As explained above, the Campbells have not pled facts to support a claim that Woods was acting within the scope and course of his employment, an essential element of liability under the theory of respondeat superior. The Court next considers RaceTrac's vicarious liability under the theory of ratification, which it also rejects.

2.    Ratification

The Campbells argue that RaceTrac ratified its employee Woods's assault "because at no

point did a manager or assistant manager at RaceTrac intervene or attempt to de-escalate Woods's assault, and/or [Woods] was acting as a manager." Doc. 16, Pl.'s Resp., ¶ 39.

Under Texas law, an employer may be liable for its employee's "intentional, malicious, or grossly negligent" acts if the employer or a manager for the employer ratifies the acts. *Prunty v. Ark. Freightways, Inc.*, 16 F.3d 649, 652–53 (5th Cir. 1994). In tort cases, "ratification may occur when the employer or its vice-principal confirms, adopts, or fails to repudiate the acts of its employee." *Id.* at 653. Texas courts generally also require that the employee have committed the assault to further the interest of the employer for the employer to later ratify it.[1] *E.g., Sheffield,* 435 S.W.2d at 956 (citing *Dillingham v. Anthony*, 11 S .W. 139 (Tex. 1889)); *Branton,* 7 S.W.2d at 629. Where the employee's tort "consists of an assault and battery," there are "but a few situations" in which the employer "may be constituted a wrongdoer by ratification." *Sheffield,* 435 S.W.2d at 956 (citing *Branton,* 7 S.W.2d at 629).

Here, the Campbells base their ratification claim on RaceTrac's failure to "intervene, attempt to stop the events, [or] apologize for the outrageous behavior of its employee," or to "follow-up with or contact the Campbells to check on their vehicle or their condition." Doc. 1-1, Original Pet., ¶ 22.

---

[1] The Fifth Circuit has held that Texas ratification law does not require that an employee's tortious act be done in the employer's interest. *Prunty,* 16 F.3d at 654 ("Where a ratification claim is based on an employer's retention of an employee who has committed a tortious act that was not done in the employer's interest, an employer may confirm, adopt, or fail to repudiate the acts of its employee when it: '(1) knows about the employee's tortious acts, (2) recognizes that the employee's acts will continue if he is retained, (3) does nothing to prevent the ongoing tortious acts, and (4) chooses to retain the employee.'" (citing *Gulf, Colo., & Santa Fe Ry. Co. v. Reed,* 15 S.W. 1105, 1107 (Tex.1891)); *Intl. & Great N. R.R. Co. v. McDonald,* 12 Sw. 860, 862 (Tex.1889)). *See also Smith v. Michels Corp.,* 2014 WL 708416, at *3 (E.D. Tex. Feb. 24, 2014) (finding a triable issue of fact on whether an employer's retention of its employee on year-long paid leave constituted ratification of the employee's tortious act and discussing the *Prunty* holding). *But see Donahue v. Melrose Hotel,* 1997 WL 148012, at *1 n.5 (N.D. Tex. Mar. 26, 1997) (reading the cases cited in *Prunty* as establishing that "mere retention cannot constitute ratification under Texas law").

In support, the Campbells cite *Sheffield*, 435 S.W.2d at 956. Doc. 16, Pl.'s Resp., ¶ 38. However, *Sheffield* shows why the Campbells' ratification claim fails.

In *Sheffield*, two freight truck drivers got into an argument following a minor collision. 435 S.W.2d at 955. One driver, Jarvis, insulted the other, Sheffield, and each man called his supervisor to the scene. *Id.* When Sheffield's supervisor, Williams, arrived, a fist fight quickly erupted between Williams and Jarvis. *Id.* Jarvis, a skilled boxer, swiftly got the better of Williams and Sheffield attempted to break up the fight, sustaining "numerous blows to his head and body" for his trouble. *Id.* Sheffield argued that Jarvis's employer was liable for his injuries "because of the failure of its other employee, [Jarvis's supervisor] Vincell, to intercede and endeavor to stop the fight, which . . . amounted to ratification by [Jarvis and Vincell's employer] of the assault." *Id.* at 956. Finding "no evidence of ratification" in these facts, the court rejected the vicarious liability claim. *Id.* The conflicts involved, it noted, were "personal altercations" and not within or incidental to the employees' truck driving or supervisory duties. *Id.* Therefore, the supervisor's failure to intervene in the fight did not amount to ratification of the employee's assault. *Id.*

Like the battered truck driver in *Sheffield*, the Campbells claim that a manager on duty at the RaceTrac should have intervened to stop Woods's assault. Doc. 16, Pl.'s Resp., ¶ 39. Alternatively, they suggest for the first time in their Response that Woods may have been acting as the RaceTrac's manager at the time of the assault. *Id.* In either case, a RaceTrac employee also should have followed up with the Campbells after the assault, they state, and the fact that no employee did so shows that RaceTrac ratified Woods's actions. Doc. 1-1, Original Pet., ¶ 22. Like the *Sheffield* court, this Court finds these facts insufficient to state a claim for ratification. As discussed above, the Campbells' account of the altercation between Woods and David supports only a plausible inference that the

two men's dispute was based on personal animosity. If a manager was on the premises, as the Campbells plead, the manager, like the supervisor in Sheffield, had no duty to intervene in a personal altercation. *See* 435 S.W.2d at 956. In the alternative, if Woods was alone and acting as a manager, he could not ratify his own personal act on RaceTrac's behalf. *See* Doc. 16, Pl.'s Resp., ¶ 39. Finally, Plaintiffs cite no case law to support their claim that an employer's failure to "follow-up with or contact" a person who has been assaulted on the employer's premises constitutes ratification. *See id.*

For these reasons, the Court concludes that Plaintiffs fail to state a claim for RaceTrac's vicarious liability for the assault, on either a theory of respondeat superior or ratification. The Court thus **DISMISSES WITH PREJUDICE** the assault claims.

C.     *Negligence per se*

The Campbells state that "RaceTrac's conduct was negligent" because the Richardson location "violate[d] laws and fell below the standards of care." Doc. 16, Pl.'s Resp., ¶ 41. Specifically, they claim that RaceTrac violated Sections 341.061, 341.091, and 341.069 of the Texas Health & Safety Code, which requires "all gas stations to maintain public restrooms." Doc. 1-1, Original Pet., ¶ *28.* This alleged violation establishes RaceTrac's negligence toward the Campbells as a matter of law, the Campbells claim. *Id.*, ¶¶ 28–32.

An unexcused violation of a statute setting an applicable standard of care may constitute negligence per se. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 312 (Tex.1987). Here, the statutory provisions at issue require the operator of a filling station to "provide and maintain sanitary toilet accommodations." Tex. Health & Safety Code Ann. § 341.061. Failure to do so is a misdemeanor. *Id.* § 341.091. Public health departments or certain government actors may also impose fines or engage in civil enforcement actions. *Id.* § 341.092.

The Campbells plead that "[i]t was a violation of the Texas Health and Safety Code for the RaceTrac not to provide public restrooms for the Campbells and other customers." Doc. 16, Pl.'s Resp., ¶¶ 58–60. However, the Campbells' pleadings clearly establish that the RaceTrac *did* provide public restrooms—restrooms that were closed at the time of their visit. Doc. 1-1, Original Pet., ¶¶ 11, 29, 40, 46. While the Campbells state that it was a violation of Texas law for the RaceTrac not to keep those restrooms open to the public, *see id.* ¶¶ 54, 60, they do not plead that the closure was permanent and cite no case law in support of their contention that it is a violation of the statute to temporarily close a public restroom. *See* Doc. 16, Pl.'s Resp. Indeed, the Campbells state that David "chose to go to the RaceTrac because he was accustomed to finding a safe, clean store with clean public restrooms." *Id.* ¶ 54. A customer who expects to find a clean public gas station restroom should not be astonished that it may sometimes be closed, perhaps for cleaning or maintenance. Therefore, the Court declines to read into the Texas statute the "always open" restroom requirement the Campbells seek to impose. *See id.* ¶ 60.

Because the Campbells have not plausibly claimed that RaceTrac committed a statutory violation, they have failed to state a claim for negligence per se. Therefore, the Court **DISMISSES WITH PREJUDICE** this claim.

D.    *General Negligence*

The Campbells claim that RaceTrac was negligent because the RaceTrac's operation "fell below the standards [RaceTrac] represents and promises to the public" and was not "healthy and safe" for customers. Doc 1-1, Original Pet., ¶¶ 36, 40. RaceTrac urges the Court to dismiss the Campbells' "generic" negligence claim because it fails to comply with the Rule 8 pleading

requirements. Doc. 13, Def.'s Br., 18.[2]

Under Texas law, the elements of a negligence cause of action are duty, breach of the duty, and damages proximately caused by the breach. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001). The Campbells plead that RaceTrac had a duty "to exercise reasonable care to provide a gas station and convenience store environment that was safe." Doc. 16, Pl.'s Response, ¶ 44. RaceTrac does not deny that it owes invitees like the Campbells a duty. *See* Doc. 13, Def.'s Br., 26. Therefore, the Court finds that the Campbells have pled sufficient facts to support the element of duty.

To avoid breach, a property owner must "do what a person of ordinary prudence in the same or similar circumstances would have done" with regards to an invitee on the property. *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 471 (Tex. 2017). The Campbells plead that RaceTrac breached its duty "by failing to operate the RaceTrac convenience store and gas station in a safe, healthy and reasonable manner." Doc. 16, Pl.'s Resp., ¶¶ 44, 46. Specifically, they claim RaceTrac "allow[ed] its employees to close the restrooms to the general public and allow[ed] its employees to harass, threaten and endanger the lives of RaceTrac's customers including Plaintiffs." Doc. 1-1, Pl.'s Original Pet., ¶ 41. As explained above, the Campbells have not pled that RaceTrac instructed or authorized Woods to assault, harass, threaten, or endanger its customers, or that such actions were

---

[2] RaceTrac also states that the Campbells appear to base their negligence claim, in part, on a theory of premises liability. Doc. 13, Def.'s Br., 26. However, under Texas law, their claim does not sound in premises liability but in general negligence. *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 471 (Tex. 2017) ("A person injured on another's property may have either a negligence claim or a premises-liability claim against the property owner…. When the injury is the result of the property's condition rather than an activity, premises-liability principles apply;" otherwise, the claim sounds in general negligence.) (citations omitted). Because the Campbells claim injuries flowing from RaceTrac's operational choices and not a physical condition, theirs' is a general negligence claim. *See id.*

related to the scope of his authority. And closing the restroom was not a statutory violation. Therefore, the Court finds that this bare and conclusory factual assertion does not support a reasonable inference that RaceTrac breached its duty in this way. *See Iqbal*, 556 U.S. at 678.

The Court finds that the Campbells have not pled specific facts that plausibly support an inference that RaceTrac breached its duty under a theory of general negligence. Therefore, they have not stated a claim for general negligence. Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** the Campbells' general negligence claim.

E.      *Negligent Hiring and Negligent Supervision*[3]

The Campbells bring a negligent hiring and supervision claim, stating that Woods was a RaceTrac employee, that "RaceTrac negligently hired and retained [Woods] as an employee who was incompetent or unfit for the job" when it "had a duty to make sure [Woods] was competent and qualified to work in a position of customer service and interaction with the general public," and that "on information and belief, [RaceTrac] also negligently hired" the supervisor on duty at the time of the alleged assault. Doc. 1-1, Original Pet., ¶¶ 50–51. The Campbells allege that a store manager was present at the time of the events and that this manager deliberately chose not to adequately and competently supervise Woods. *Id.* ¶ 51. Instead, this supervisor "chose not to become involved or otherwise take control of the situation."[4] *Id.* RaceTrac states that the Campbells' claims related to

---

[3] The Campbells include allegations of RaceTrac's negligent supervision within their general negligence claim. However, Texas courts often consider negligent supervision with negligent hiring, using the same elements and analysis for both. *See Harris v. Mastec N. Am., Inc*, 2020 WL 6305028, at *7 (Tex. App.—Dallas Oct. 28, 2020, no writ); *Houser v. Smith*, 968 S.W.2d 542, 544 (Tex. App.—Austin 1998, no pet.) The Court therefore construes the Campbells' supervisory-based negligence claims as a claim for negligent supervision and considers this claim together with the negligent hiring claim.

[4] The Campbells alternatively claim that Woods was alone and serving as a manager, as discussed *infra* note 5. *Id.* at ¶ 39.

negligent hiring and supervision are conclusory and unsupported by factual allegations. Doc. 12, Def.'s Mot., 6.

The Texas Supreme Court "ha[s] not ruled definitely on the existence, elements, and scope of torts such as negligent retention and supervision of an employee by an employer and related torts such as negligent hiring and training." *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 505 (Tex. 2017) (quoting *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 n.27 (Tex. 2010)) (alteration in original); *Endeavor Energy Res., L.P. v. Cuevas*, 593 S.W.3d 307, 311 (Tex. 2019). But lower courts have held that "[a]n employer may have direct liability for an employee's negligent conduct if the employer failed to properly hire, train, or supervise the employee and the plaintiff's injuries arose from the employer's conduct." *Harris v. Mastec N. Am., Inc.*, 2020 WL 6305028, at *7 (Tex. App.—Dallas Oct. 28, 2020, no pet.) (citing *Patino v. Complete Tire, Inc.*, 158 S.W.3d 655, 660 (Tex. App.—Dallas 2005, pet. denied)); *Houser v. Smith*, 968 S.W.2d 542, 544 (Tex. App.—Austin 1998, no pet.). A claim for negligent hiring or supervision is based upon two separate acts: (1) the employer's negligence in hiring or supervising the employee, and (2) the employee's subsequent negligent act that caused the plaintiff's injuries. *See Cuevas* at 311; *Harris*, 2020 WL 6305028, at *7 (discussing a negligent hiring and supervision claim based on an employee's assault of a customer). The plaintiff must show "that the [employee's] negligence proximately caused the harm" and "that the risk that caused [the hiring or supervision] to be negligent also proximately caused the plaintiff's injuries." *See Cuevas*, 593 S.W.3d at 311 (citing *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 240 (Tex. 2010)); *Harris*, 2020 WL 6305028, at *7.

Here, to avoid dismissal for failure to state a claim, the Campbells must plead facts that, taken as true and viewed in the light most favorable to them, would plausibly support an inference that

RaceTrac's hiring process negligently failed to discover some information that would have put it on notice that Woods might foreseeably assault a customer, or that RaceTrac's supervision was negligent in some specific way that resulted in the Campbells' injury. *See, e.g.*, *Houser*, 968 S.W.2d at 545; *LaBella v. Charlie Thomas, Inc.*, 942 S.W.2d 127, 137 (Tex. App.—Amarillo 1997, writ denied); *see also Lozano v. Baylor Univ.*, 408 F. Supp. 3d 861, 896 (W.D. Tex. 2019).

The Campbells have met this burden for their negligent supervision claim, but not for their negligent hiring claim. As to negligent hiring, the Campbells offer only conclusory statements that RaceTrac negligently hired an "incompetent or unfit" employee and supervisor. Doc. 1-1, Original Pet., ¶¶ 50–51. This is not sufficient. *See Iqbal*, 556 U.S. at 664 (noting that legal conclusions are not "entitled to the assumption of truth"). Therefore, the Court finds that the Campbells have failed to state a claim for negligent hiring.

The Campbells plead negligent supervision with slightly more specificity, stating that "a store manager was present during the altercation and *deliberately chose*" not to "adequately and competently supervise [Woods]," take control of the situation, or otherwise intervene. Doc. 1-1, Original Pet., ¶ 51 (emphasis added). Assuming (as the Court must) that this is true, such a choice *might* breach a duty owed by an employer to a customer.[5] *See Pagayon*, 536 S.W.3d at 506. And, such

---

[5] The Court notes that the Texas Supreme Court has disapproved of finding that an employer had a duty to a third party, based on a theory of negligent supervision, in *Pagayon*, which presented somewhat analogous facts. 536 S.W.3d at 506. In that case, the court emphasized that ascertaining whether a duty exists is a threshold "question of law for the court to decide from the facts surrounding the occurrence in question." *Id.* at 503. Before finding that the employer has a duty on which a claim of negligent supervision can stand, a court must "analyze[]the risk, foreseeability, and likelihood of injury in requiring employers to control employees, versus the burdens on and consequences to employers, and the social utility and realities of the workplace." *Id.* at 506. "It is not enough simply to require employers, or others, to exercise ordinary care in all circumstances." *Id.* Instead, "Texas law requires the court to be more specific, to balance the relevant factors in determining the existence, scope, and elements of legal duties." *Id.* In conducting this duty analysis, "the material facts are . . . viewed in the light required by the procedural posture of the case," while "[t]he

nonaction in the face of a volatile argument *might* foreseeably lead to further conflict and a customer's injury. *But see id.* (finding that "[t]he foreseeability of injury is small" where "disagreements . . . had been matters of words until the fistfight suddenly broke out"). Moreover, the Campbells plead that the alleged assault caused them injury including "severe anxiety, fear, and mental anguish" and "damages to their vehicle." *Id.* ¶ 33. Viewed in the light most favorable to the Campbells, these facts *might* plausibly support an inference that RaceTrac owed a duty to the Campbells in this situation and that its negligent supervision and Woods' negligence were the but for and proximate cause of the Campbells' claimed injuries. Thus, the Court finds that the Campbells have pled sufficient facts to state a claim for negligent supervision.

The Court finds that the Campbells have stated a claim for negligent supervision but have not pled specific facts to state a claim for negligent hiring. Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** the Campbells' negligent hiring claim.

F.      *Exemplary Damages*

The Campbells state that RaceTrac is liable, as a principal, for punitive or exemplary damages as a result of the acts of its agent Woods. Doc. 16, Pl.'s Resp., ¶ 64–65. The Campbells base this

---

policy components of the factors—including the nature of the covered risks and general foreseeability—are policy issues for the court to consider as a matter of law." *Id.* at 504. *Pagayon* was decided after the case's factual issues had been resolved at trial. *Id.* at 503. Noting that the facts were therefore undisputed, the court held that the employer convenience store operator did not have a duty to stop its employees from engaging in a fistfight that led to a third-party's death, where the dispute was personal, the employees' "disagreements . . . had been matters of words until the fistfight suddenly broke out," and the injuries incurred as a result of the fight were unforeseeable. *Id.* at 506. By contrast, the instant case is before the Court on a 12(b)(6) motion to dismiss. The facts as presented by the Campbells are somewhat distinguishable from those presented in *Pagayon* and are less developed. Therefore, the Court declines to find at this stage that RaceTrac did not owe a supervisory duty to the Campbells as a matter of law.

argument on the fact that RaceTrac "failed to act and deliberately chose to ignore the situation and [Woods's] acts and failed to de-escalate his behavior." *Id.*, ¶ 65. RaceTrac states that the Campbells "fail to plead any facts to demonstrate or even suggest that RaceTrac acted with 'malice' or 'specific intent' to harm the Campbells" and that their claims therefore fail to meet the pleading standard required by Rule 8. Doc. 19, Def.'s Reply, 10.

Under Texas law:

> A principal . . . is liable for exemplary or punitive damages because of the acts of his agent, but only if: '(a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or © the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the employer or a manager of the employer ratified or approved the act.'

*Purvis v. Prattco, Inc.*, 595 S.W.2d 103, 104 (Tex. 1980) (quoting *Fischer v. Carrousel Motor Hotel, Inc.*, 424 S.W.2d 627 (Tex. 1967)).

Here, the Court has explained above that the pleadings do not establish that RaceTrac "authorized the doing or manner of" Woods's alleged assault. *See Purvis*, 595 S.W.2d at 104. So, the first prong does not apply. Likewise, the Court has explained above that the Campbells have not sufficiently alleged that RaceTrac was reckless in employing Woods. So, the second prong does not apply. Further, the Court has concluded above that Woods's alleged assault was not within the scope of his employment, so even if he was employed in a managerial capacity, the third prong does not apply.[6] Finally, as the Court explained above, there is no evidence that RaceTrac ratified Woods's

---

[6] The Campbells have alternatively pled that Woods was working alone at the time of the event and therefore may have been functioning as a manager. Doc. 16, Pl.'s Resp., ¶ 65. They appear to cite *Purvis* for the proposition that an employee who is left charge of the premises overnight may be a manager. *See* Doc. 16, Pl.'s Resp., ¶ 65 (citing *Purvis*, 595 S.W.2d at 105). However, *Purvis* involved an employee who was acting in the scope of his employment when committing the allegedly tortious act. 595 S.W.2d at 105. The same

acts. So, the fourth prong does not apply.

Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** the Campbells' exemplary damages claim.

G.   *Amendment of Pleadings*

The Campbells did not request leave to amend their pleadings if the Court determined they have failed to state a claim upon which relief can be granted. *But see* Doc. 16, Pl.'s Resp., 29 (requesting all relief to which Plaintiff may be justly entitled). However, under the Federal Rules of Civil Procedure, the court should freely give leave to amend when justice so requires. *See* Fed. R. Civ. P. 15(a)(2). The decision to allow amendment of a party's pleadings is within the sound discretion of the district court. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994). In determining whether to allow such amendment, a court considers the following: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman*, 371 U.S. at 182; *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 566 (5th Cir. 2003) (citation omitted).

Here, the Court finds that it is in the interest of justice that the Campbells be given one opportunity to replead the claims the Court has deemed insufficiently alleged and for which amendment would not be futile. Accordingly, the Court **GRANTS LEAVE** to Plaintiffs to file an amended complaint pleading additional facts to sufficiently support their claims for general

---

is true in the other case cited by the Campbells, *Ramos*. *See* Doc. 16, Pl.'s Resp., ¶ 65 (citing 784 S.W.2d at 668).

negligence, negligent hiring, and exemplary damages (as to the reckless hiring prong only), within **FOURTEEN (14)** days of the date of this Order, should they choose to do so.

## IV.

## CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion to dismiss (Doc. 12).

The Court **DENIES** Defendant's motion with regard to the negligent supervision claim.

The Court **GRANTS** Defendant's motion and **DISMISSES WITH PREJUDICE** Plaintiffs' claims for violation of the DTPA, assault, and negligence per se.

The Court **DISMISSES WITHOUT PREJUDICE** Plaintiffs' claims for general negligence, negligent hiring, and exemplary damages. Plaintiffs may file an amended complaint as to the general negligence, negligent hiring, and exemplary damages claims only, either omitting or remedying any claims deemed insufficiently alleged, within **FOURTEEN (14)** days of this Order.

SO ORDERED.

SIGNED: October 5, 2021.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE